UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS MONAGHAN, and
DOMINO'S FARMS CORP.,

                                                                                                                Case No. 12-15488

     Plaintiffs,                                                          Hon. Lawrence P. Zatkoff

v.

KATHLEEN SEBELIUS, *et al*,

     Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on December 30, 2012.

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Plaintiffs' Emergency Motion for a Temporary Restraining Order [dkt 8]. The Government filed a response [dkt 12]. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the Motion be resolved on the briefs submitted, without oral argument. For the following reasons, Plaintiffs' Motion is GRANTED.

**II. BACKGROUND**

Plaintiff Thomas Monaghan ("Monaghan") is the owner and sole shareholder of Plaintiff Domino's Farms Corp., ("DF") a secular, for-profit property management company. On December 14, 2012, Plaintiffs filed a complaint for declaratory judgment and injunctive relief regarding whether they must comply with the Preventive Health Services coverage provision ("mandate") in the Women's Health

Amendment, 42 U.S.C. § 300gg–13(a)(4), to the Patient Protection and Affordable Care Act of 2010, ("the ACA"), Pub. L. No. 111–148, 124 Stat. 119 (Mar. 23, 2010), as amended by the Heath Care and Education Reconciliation Act, Publ. L. No. 111–152, 124 Stat. 1029 (Mar. 30 2010).  The named Defendants are the three federal government agencies charged with implementing and administering the mandate and the individuals heading these agencies: the Department of Health and Human Services and Secretary Kathleen Sebelius; the Department of the Treasury and Secretary Timothy F. Geithner; and the Department of Labor and Secretary Hilda L. Solis.

The ACA "aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012).  In deciding to include a contraception coverage mandate, Congress found that: (1) the use of preventive services, including contraception, results in a healthier population and reduces health care costs (for reasons related and unrelated to pregnancy); and (2) access to contraception improves the social and economic status of women.  *See* 77 Fed. Reg. 8725, 8727–8728 (Feb. 15, 2012).

According to the contraception coverage mandate, commencing in plan years after August 1, 2012, and unless "grandfathered" or otherwise exempt, employee group health benefit plans and health insurance issuers must include coverage, without cost sharing, for all FDA approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity.  *See* Health Resources and Services Administration ("the HRSA"), *Women's Preventive Services: Required Health Plan Coverage Guidelines* (available at http://www.hrsa.gov/womensguidelines/).  FDA-approved contraceptive medicines and devices include barrier methods, implanted devices, hormonal methods, and emergency contraceptive "abortifacients," such as "Plan B" (which prevents fertilization of the egg) and "Ella" (which stops or delays release of the

2

egg). *See* FDA, Birth Control Guide (Aug. 2012) (available at www.fda.gov/ForConsumers/ByAudience/ForWomen/ucm18465).

Employers with at least 50 employees that do not comply with the mandate face fines, penalties in the form of a tax, and enforcement actions for non-compliance. *See* 29 U.S.C. § 1132(a) (civil enforcement actions by the Department of Labor and insurance plan participants); 26 U.S.C. § 4980D(a),(b) (penalty of $100 per day per employee for noncompliance with coverage provisions of the ACA); 26 U.S.C. § 4980H (annual tax assessment for noncompliance with requirement to provide health insurance)." *Tyndale House Publishers, Inc. v. Sebelius*, No. 12-1635, 2012 WL 5817323 at *2 (D.D.C., Nov. 16, 2012). *See also* 77 Fed. Reg. 8725, 8729 (Feb. 15, 2012).

Monaghan is a member of the Catholic Church. He asserts that his Catholic beliefs are in line with Pope Paul VI's 1968 encyclical *Humanae Vitae*, which states "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means"—including contraception—is a grave sin. *See* Dkt. 8, ex. 2 at ¶¶ 12–15, 24–25, 31. Monaghan also states that he subscribes to authoritative Catholic teaching regarding the proper nature of health care and medical treatment. For instance, Monaghan believes, in accordance with Pope John Paul II's 1995 encyclical *Evangelium Vitae*, that "'[c]ausing death' can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life." *Id.* Plaintiffs do not believe that contraception or abortion properly constitute health care, and involve immoral practices and the destruction of innocent human life. *Id.* at ¶¶ 24–25.

On these bases, Monaghan contends that his compliance with the mandate would require him to violate his religious beliefs because the mandate forces him, and/or the corporation he controls, to pay for, provide, facilitate, or otherwise support contraception, sterilization and to some extent, abortion. If DF

does not provide the mandated contraceptive coverage, Plaintiffs estimate that DF will be required to pay approximately $200,000 per year as a tax and/or penalty. Plaintiffs do not want to forego providing health coverage because doing so would impact DF's ability to compete with other companies that offer such coverage, and its employees would have to obtain expensive individual policies in the private marketplace.

On December 14, 2012, Plaintiffs brought suit contending that the ACA mandate violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb–1 (2006), the Administrative Procedures Act ("APA"), 5 U.S.C. § 500 *et seq.,* and the Free Exercise, Free Association, Establishment, and Free Speech clauses of the First Amendment.

On December 21, 2012, Plaintiffs filed the instant Emergency Motion for a Temporary Restraining Order relative to their RFRA and First Amendment free exercise, free speech, and free association claims, seeking to enjoin the Government from enforcing the mandate against Plaintiffs. Defendants filed a response on December 25, 2012.

## II. LEGAL STANDARD

The factors to be weighed before issuing a TRO are the same as those considered for issuing a preliminary injunction. *See, e.g., Workman v. Bredesen*, 486 F.3d 896, 904–05 (6th Cir. 2007). In determining whether or not to grant a preliminary injunction, a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). *See also Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007).

A reviewing court generally will balance these factors, and no single factor will necessarily be determinative of whether or not to grant the injunction. *Connection Distributing Co.*, 154 F.3d at 288.

Courts, however, may grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of success on the merits, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued. *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982)) (emphasis added).

## III. ANALYSIS

### A. Likelihood of Success on the Merits – RFRA Claim[1]

*1. Standing*

Inherent to an analysis of whether Plaintiffs are likely to succeed on the merits of their RFRA claim is the question of whether Plaintiffs may make such a claim to begin with. The relevant portion of the RFRA reads as follows:

> Government shall not substantially burden *a person's* exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

42 U.S.C. § 2000bb–1(a)(emphasis added). The language of the RFRA raises the issue of whether DF—a secular, for-profit business organization with a single owner and director—has the right to freely exercise religion. A corollary to this is the question of whether Monaghan may project his personal free exercise rights through DF, even though the ACA does not, by its terms, require Monaghan to do anything in his individual capacity. For purposes of granting the instant Motion, it is sufficient for the Court to find that Monaghan may bring a claim under the RFRA based on his argument that the mandate requires him to perform an act that is at odds with his religious beliefs.

---

[1] The Court's analysis addresses only Plaintiffs' RFRA claim. The Court finds that it need not include a separate discussion of Plaintiffs' Free Exercise claim since both theories seek to protect the same liberty interest—the free practice of one's religion. *See Legatus v. Sebelius*, No. 12-12061, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012).

Monaghan states that once the mandate takes effect, he—as sole owner and director of DF—will be required by law to provide, through DF, health insurance coverage for contraception. Monaghan asserts that acting to have his company provide such coverage would cause him to commit a grave sin according to his religious beliefs. This argument is well-taken, since DF cannot act (or sin) on its own. Therefore, even though the ACA does not literally apply to Monaghan, the Court is in no position to declare that acting through his company to provide certain health care coverage to his employees does *not* violate Monaghan's religious beliefs. They are, after all, *his* religious beliefs. *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981) (finding it beyond the scope of judicial function and competence for a court to decide whether a party is correctly understanding his religious doctrine because "[c]ourts are not arbiters of scriptural interpretation."). Accordingly, Monaghan has standing to make his claim under the RFRA. The Court takes no position as to whether DF, as a for-profit business, has an independent right to freely exercise religion. *See Legatus*, 2012 WL 5359630 at *4 ("[plaintiff corporation] was founded as a family business and remains a closely held family corporation. Accordingly, the court need not, and does not, decide whether [plaintiff], as a for-profit business, has an independent First Amendment right to free exercise of religion.").

*2. Substantial Burden*

The RFRA "provides a statutory claim to individuals whose religious exercise is burdened by the federal government." *United States v. Wilgus*, 638 F.3d 1274, 1279 (10th Cir. 2011). Congress passed RFRA to restore the compelling interest test that had been applied to laws substantially burdening religious exercise before the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). Thus, under the RFRA, strict scrutiny applies to federal statutes that substantially burden a person's exercise of religion.

6

The particular burden cited by Plaintiffs is the requirement that DF provide a health insurance plan that includes the contraceptive coverage required by the ACA. The Catholic Church teaches that it is a sin to use, provide, or otherwise support contraception. Monaghan is a member of the Catholic Church. He asserts that taking steps to have DF provide contraception coverage violates his beliefs as a Catholic. If Monaghan chooses to not have DF provide coverage in order to avoid the mandate, then beginning in 2014, DF will incur an annual penalty of $2,000 per full-time employee.

The Supreme Court has held that "putting substantial pressure on an adherent to modify his behavior and to violate his beliefs" substantially burdens a person's exercise of religion. *Thomas,* 450 U.S. at 718. As noted, the Court is in no position to decide whether and to what extent Monaghan would violate his religious beliefs by complying with the mandate. *Id*. at 716. Other courts have assumed that a law substantially burdens a person's free exercise of religion based on that person's assertions. *See U.S. v. Lee*, 455 U.S. 252, 257 (1982) ("We therefore accept appellee's contention that both payment and receipt of social security benefits is forbidden by the Amish faith."); *May v. Baldwin,* 109 F.3d 557, 563 (9th Cir. 1997) ("[W]e will assume that undoing May's dreadlocks imposes a substantial burden on his exercise of Rastafarianism."); *Hamilton v. Schriro,* 74 F.3d 1545, 1552 (8th Cir. 1996) ("[W]e assume that the regulations and policies at issue in the present case substantially burden Hamilton's exercise of his religion.").

As such, the Court will assume that abiding by the mandate would substantially burden Monaghan's adherence to the Catholic Church's teachings. The Court turns next to the question of whether the government has satisfied its burden to show that the mandate was nevertheless narrowly tailored to serve a compelling government interest.

*3. Compelling Government Interest/Least Restrictive Means*

The Government may substantially burden a person's exercise of religion "only if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest." 42 U.S.C. § 2000bb–1(b)(1). A "compelling interest" is one "of the highest order." *Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972). The government bears the burden of proof and "ambiguous proof will not suffice." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2739 (2011). To satisfy this burden, the Government must "specifically identify an 'actual problem' in need of solving," and show that substantially burdening Plaintiffs' free exercise of religion is "actually necessary to the solution." *Id.* at 2739.

The Government advances two interests furthered by the mandate. First, the Government has an interest in promoting public health generally. Courts have assumed, sometimes without deciding, that the improvement of public health is, at least in some instances, a compelling interest. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 310 (1978) ("It may be assumed that in some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a suspect classification."); *Buchwald v. Univ. of N.M. School of Med.*, 159 F.3d 487, 498 (10th Cir. 1998) (finding that "public health is a compelling government interest"). The Government argues that the primary benefit of the regulations is that "individuals will experience improved health as a result of reduced transmission, prevention or delayed onset, and earlier treatment of disease." *See* Dkt. 12 at 16. Additionally, the Government expects the regulations to increase access to and utilization of preventative services, which are not used at optimal levels today, by expanding coverage and eliminating cost sharing for recommended preventive services. *Id.* According to the Government's theory, increased access to contraceptive services is a key part of these predicted health outcomes, as a lack of contraceptive use may prove to have negative health consequences. *Id.*

The Government's second proposed interest is to "remov[e] the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women" by "[a]ssuring women equal access to . . . goods, privileges, and advantages[.]" *Id*. (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)). The Government states that by including in the ACA gender-specific preventive health services for women, Congress assured that the goals and benefits of effective preventive health care would apply with equal force to women, who might otherwise be excluded from the ACA. The Government notes that "women have different health needs than men, and these needs often generate additional costs. Women of childbearing age spend 68 percent more in out-of-pocket health care costs than men." *Id.* at 17.  These costs result in women often forgoing preventive care. *Id.*  Accordingly, this disproportionate burden on women creates "financial barriers . . . that prevent women from achieving health and wellbeing for themselves and their families." *Id.*

Plaintiffs state that the Government has not shown an "actual problem in need of solving," the solution to which requires certain individuals—such as Monaghan—to violate their religious beliefs. The "promotion of public health," does not indicate what actual, specific problem is in need of solving. Plaintiff also points to the fact that Defendant Health and Human Services has provided for several exemptions to the mandate, based on such factors as the size of the employer, and whether an insurance plan is "grandfathered."  A plan is considered "grandfathered" if an individual was enrolled in the plan on March 23, 2010, the date on which the ACA was enacted.  75 Fed. Reg. 34,540.  Approximately 193 million health plans were in existence on March 23, 2010, and were therefore required to comply with some, but not all, of the ACA's provisions. *Id.*  Plaintiffs question why such exemptions are needed if the Government's stated goals are of paramount importance, and why the only way to actually solve the cited problems is to enforce the mandate.  Plaintiffs thus appear to argue that the Government undermined its compelling interests by not enforcing the mandate against all health plans immediately when the ACA

9

was enacted. For these reasons, Plaintiff asserts that there is no compelling reason to force certain employers, such as Plaintiffs, to violate their religious beliefs.

If the Government meets the compelling interest test, it must also prove that it has chosen the least restrictive means of furthering that interest. 42 U.S.C. § 20000bb–1(b)(2). The Sixth Circuit describes the least restrictive means test as "the extent to which accommodation of the [plaintiff] would impede the state's objectives," and explains that "[w]hether the state has made this showing depends on a comparison of the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." *S. Ridge Baptist Church v. Indus. Comm'n*, 911 F.2d 1203, 1206 (6th Cir. 1990).

Granting an additional exemption would not significantly impede the Government's objectives, at least in regard to the Plaintiffs in this case. The Parties have not provided briefing on the issue of whether and to what extent the Government would be harmed should other, similarly situated plaintiffs bring similar suits against the Government. Additionally, Plaintiffs set forth several alternative means for the Government to use to address their interests. Plaintiffs propose that the Government could provide the contraceptive services directly, or perhaps offer incentives to employers who provide for such services (as opposed to sanctioning employers who do not). In dealing with nearly identical factual circumstances, other courts have found that the government failed to meet its burden of proof. See *Newland v. Sebelius*, No. 12–1123, 2012 WL 3069154 at *8 (D. Colo. July 27, 2012) ("Defendants have failed to adduce facts establishing that government provision of contraception services will necessarily entail logistical and administrative obstacles defeating the ultimate purpose of providing no-cost preventative health care coverage to women."); *Legatus*, 2012 WL 5359630 at *11 ("The cost to Plaintiffs appears provably substantial. The cost to the Government appears provably small[.]").

The Court finds that the parties have set forth plausible arguments in connection with the compelling interest and least restrictive means factors. Yet at this point, the Court has insufficient information before it to adequately determine whether the Government's interests are sufficiently "compelling," or whether the Government's actions are the least restrictive. Thus the Government has failed to carry its burden.

*4. Conclusion*

Plaintiff has shown that abiding by the mandate will substantially burden his exercise of religion. The Government has failed to satisfy its burden of showing that its actions were narrowly tailored to serve a compelling interest. Therefore, the Court finds that Plaintiffs have established at least some likelihood of succeeding on the merits of their RFRA claim, or at least some "serious questions going to the merits" of the claim. *Caruso*, 569 F.3d at 277. Accordingly, this factor weighs in favor of granting Plaintiffs' motion. The Court turns next to the remaining factors to consider when assessing preliminary injunctive relief.

**B. IRREPARABLE HARM TO PLAINTIFF**

The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, when First Amendment freedoms are at risk, the irreparable harm factor "merges" with the likelihood of success, such that if the plaintiff shows he is likely to succeed on the merits, he has simultaneously proven he will suffer an irreparable harm. *See McNeilly v. Land*, 684 F.3d 611, 620–21 (6th Cir. 2012) ("Once a probability of success on the merits was shown, irreparable harm followed . . . . Because [the plaintiff] does not have a likelihood of success on the merits, . . . his argument that he is irreparably harmed by the deprivation of his First Amendment rights also fails.").

Because Plaintiffs' claims involve a First Amendment right, and because the Court has found some likelihood that Plaintiffs' RFRA claim will succeed on the merits, the Court finds that irreparable harm could result to Plaintiff. This factor therefore weighs in favor of granting Plaintiffs' motion.

**C. IMPACT ON PUBLIC INTEREST**

The impact of a preliminary injunction on the public interest turns in large part on whether Plaintiffs' Constitutional rights are violated by the enforcement of the mandate. "[I]t is always in the public interest to prevent the violation of a party's Constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see also Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (stating "the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties"). As noted, Plaintiffs' Constitutional right to freely exercise religion is at issue in this case. It is in the best interest of the public that Monaghan not be compelled to act in conflict with his religious beliefs. This factor thus weighs in favor of granting Plaintiffs' motion.

**D. BALANCING HARM**

Finally, the Court must balance the harm to Plaintiffs if the injunction is denied with the harm to the Government if the injunction is granted. So long as Plaintiffs' have shown "serious questions" as to the merits of their RFRA claim, and irreparable harm that outweighs any potential harm to the government, the Court may grant Plaintiffs' motion. *Caruso*, 569 F.3d at 277 (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982)) (emphasis added).

At this point, the Court may reasonably conclude that this case will not be resolved before January 1, 2013—the date on which the mandate takes effect. As such, denying Plaintiffs' motion will result in a substantial burden on Monaghan's right to free exercise of religion, since on January 1, 2013, Monaghan must choose whether to abide by the mandate and violate his beliefs, or accept the financial

consequences of not doing so. And, as noted, such an infringement upon Plaintiffs' First Amendment rights—even if for a short time—constitutes irreparable injury. See *Elrod*, 427 U.S. at 373.

The Government will suffer some, but comparatively minimal harm if the injunction is granted. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (noting that "the government presumably would be substantially harmed if enforcement of a *constitutional* law . . . were enjoined"). The harm of delaying the implementation of a statute that may later be deemed constitutional is outweighed by the risk of substantially burdening the free exercise of religion. *See Legatus*, 2012 WL 5359630 at *4. Moreover, the harm of carving out, at least temporarily, an additional exemption for an organization with less than 100 employees can hardly be considered a significant or "irreparable" harm to the Government. Therefore, this factor weighs in favor of granting Plaintiffs' motion.

## V. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Plaintiffs' Emergency Motion for a Temporary Restraining Order [dkt 8] is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs shall submit to the Court a form of Temporary Restraining Order consistent with this Opinion.

IT IS SO ORDERED.

Date: December 30, 2012                      s/Lawrence P. Zatkoff
                                                                                                                                                  Lawrence P. Zatkoff
                                                                                                                                                     U.S. District Judge