**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

THOMAS MONAGHAN, and
DOMINO'S FARMS CORP.,

                Case No. 12-15488

    Plaintiffs,                    Hon. Lawrence P. Zatkoff

    v.

KATHLEEN SEBELIUS, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, SECRETARY OF LABOR HILDA L.
SOLIS, UNITED STATES DEPARTMENT OF
LABOR, TIMOTHY GEITHNER, and UNITED
STATES DEPARTMENT OF TREASURY,

    Defendants.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on March 14, 2013.

PRESENT:  THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

### I.  INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction [dkt 20].  The

motion has been fully briefed, and on January 31, 2013, the Court held oral argument.  For the following

reasons, Plaintiffs' Motion is GRANTED.

### II.  BACKGROUND

Plaintiff Thomas Monaghan ("Monaghan") is the owner and sole shareholder of Plaintiff

Domino's Farms Corp., ("DF") a secular, for-profit property management company.  On December 14,

2012, Plaintiffs filed a complaint for declaratory judgment and injunctive relief regarding whether they

must comply with the Preventive Health Services coverage provision ("mandate") in the Women's Health

Amendment, 42 U.S.C. § 300gg–13(a)(4), to the Patient Protection and Affordable Care Act of 2010, ("the ACA"), Pub. L. No. 111–148, 124 Stat. 119 (Mar. 23, 2010), as amended by the Heath Care and Education Reconciliation Act, Publ. L. No. 111–152, 124 Stat. 1029 (Mar. 30 2010). The named Defendants are the three federal government agencies charged with implementing and administering the mandate and the individuals heading these agencies: the Department of Health and Human Services and Secretary Kathleen Sebelius; the Department of the Treasury and Secretary Timothy F. Geithner; and the Department of Labor and Secretary Hilda L. Solis.

The ACA "aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012). In deciding to include a contraception coverage mandate, Congress found that: (1) the use of preventive services, including contraception, results in a healthier population and reduces health care costs (for reasons related and unrelated to pregnancy); and (2) access to contraception improves the social and economic status of women. *See* 77 Fed. Reg. 8725, 8727–28 (Feb. 15, 2012).

According to the contraception coverage mandate, commencing in plan years after August 1, 2012, and unless "grandfathered" or otherwise exempt, employee group health benefit plans and health insurance issuers must include coverage, without cost sharing, for all FDA approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity. *See* Health Resources and Services Administration ("the HRSA"), *Women's Preventive Services: Required Health Plan Coverage Guidelines* (available at http://www.hrsa.gov/womensguidelines/). FDA-approved contraceptive medicines and devices include barrier methods, implanted devices, hormonal methods, and emergency contraceptive "abortifacients," such as "Plan B" (which prevents fertilization of the egg) and "Ella" (which stops or delays release of the egg). *See* FDA, Birth Control Guide (Aug. 2012) (available at www.fda.gov/For Consumers/ByAudience/ForWomen/ucm18465).

2

Employers with at least 50 employees that do not comply with the mandate face fines, penalties in the form of a tax, and enforcement actions for non-compliance. *See* 29 U.S.C. § 1132(a) (civil enforcement actions by the Department of Labor and insurance plan participants); 26 U.S.C. § 4980D(a),(b) (penalty of $100 per day per employee for noncompliance with coverage provisions of the ACA); 26 U.S.C. § 4980H (annual tax assessment for noncompliance with requirement to provide health insurance)." *Tyndale House Publishers, Inc. v. Sebelius*, No. 12-1635, 2012 WL 5817323 at *2 (D.D.C., Nov. 16, 2012). *See also* 77 Fed. Reg. 8725, 8729 (Feb. 15, 2012).

Monaghan is a member of the Catholic Church. He asserts that his Catholic beliefs are in line with Pope Paul VI's 1968 encyclical *Humanae Vitae*, which states "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means"—including contraception—is a grave sin. *See* Dkt. 8, ex. 2 at ¶¶ 12–15, 24–25, 31. Monaghan also states that he subscribes to authoritative Catholic teaching regarding the proper nature of health care and medical treatment. For instance, Monaghan believes, in accordance with Pope John Paul II's 1995 encyclical *Evangelium Vitae*, that "'[c]ausing death' can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life." *Id.* Plaintiffs do not believe that contraception or abortion properly constitute health care, and involve immoral practices and the destruction of innocent human life. *Id.* at ¶¶ 24–25.

On these bases, Monaghan contends that his compliance with the mandate would require him to violate his religious beliefs because the mandate forces him, and/or the corporation he controls, to pay for, provide, facilitate, or otherwise support contraception, sterilization and to some extent, abortion (hereinafter the "Preventive Services"). If DF does not provide the mandated contraceptive coverage, Plaintiffs estimate that DF will be required to pay approximately $200,000 per year as a tax and/or penalty. Plaintiffs do not want to forego providing health coverage because doing so would impact DF's

ability to compete with other companies that offer such coverage, and its employees would have to obtain expensive individual policies in the private marketplace.

On December 14, 2012, Plaintiffs brought suit contending that the ACA mandate violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb–1 (2006), the Administrative Procedures Act ("APA"), 5 U.S.C. § 500 *et seq.*, and the Free Exercise, Free Association, Establishment, and Free Speech clauses of the First Amendment.

On December 21, 2012, Plaintiffs filed an Emergency Motion for a Temporary Restraining Order relative to their RFRA and First Amendment free exercise, free speech, and free association claims, seeking to enjoin the Government from enforcing the mandate against Plaintiffs. Defendants filed a response on December 25, 2012. The Court granted the Motion for a Temporary Restraining Order on December 31, 2013.

On January 8, 2013, Plaintiffs filed the instant Motion for a Preliminary Injunction. The Court held a hearing on the Motion on January 31, 2013. At the hearing, the Court ordered the parties to submit supplemental briefing on or before February 14, 2013.

In connection with the instant Motion, the Court accepted the following *amicus curiae* briefs: Brief in Support of Granting Preliminary Injunction from Michigan Attorney General Bill Schuette, filed on January 29, 2013; Brief in Support of Denying Preliminary Injunction by the American Civil Liberties Union on January 31, 2013; Brief in Support of Granting Preliminary Injunction from the Bioethics Defense Fund, the Breast Cancer Prevention Institute, and the Life Legal Defense Foundation, filed on February 19, 2013. Additionally, the parties filed supplemental authority on February 28, March 1, and March 5, 2013.

### III. LEGAL STANDARD

In determining whether or not to grant a preliminary injunction, a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer

4

irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). *See also Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007).

A reviewing court generally will balance these factors, and no single factor will necessarily be determinative of whether or not to grant the injunction. *Connection Distributing Co.*, 154 F.3d at 288. Courts, however, may grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of success on the merits, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued. *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982)) (emphasis added).

## IV. ANALYSIS

As an initial matter, the Court notes that its analysis with respect to the instant motion largely mirrors that of the Court's December 31, 2012, Order granting Plaintiffs' Motion for a Temporary Restraining Order. Nevertheless, given the emergency nature of that motion and the parties' subsequent oral argument and briefing, the Court sees fit to supplement its prior analysis.

### A. LIKELIHOOD OF SUCCESS ON THE MERITS – RFRA CLAIM[1]

#### 1. Standing

Inherent to an analysis of whether Plaintiffs are likely to succeed on the merits of their RFRA claim is the question of whether Plaintiffs may make such a claim to begin with. The relevant portion of the RFRA reads as follows:

---

[1] The Court's analysis addresses only Plaintiffs' RFRA claim. The Court finds that it need not include a separate discussion of Plaintiffs' Free Exercise claim since both theories seek to protect the same liberty interest—the free practice of one's religion. *See  Legatus v. Sebelius*, No. 12-12061, 2012 WL 5359630, at *3 (E.D. Mich. Oct. 31, 2012).

> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

42 U.S.C. § 2000bb–1(a)(emphasis added).   Although the Government does not appear to have taken a position as to whether a corporation falls within the meaning of "person" in the RFRA, the Government nevertheless argues that DF—as a secular, for-profit business organization with a single owner and director—cannot "exercise religion" in the context of the RFRA.

Neither the Supreme Court nor the Sixth Circuit has determined whether for-profit, secular corporations possess the free exercise rights held by individuals.   Other courts, however, have found that for-profit corporations can maintain some religious objectives.   Where the beliefs of a closely-held corporation and its owner are indistinguishable, "united by their [ ] faith . . . [and] shared, religious objectives[,]" the corporation has standing to assert the free exercise rights of its owners.   *Tyndale House*, 2012 WL 5817323, at *5–7 (quoting *Equal Employment Opportunity Commission v. Townley Engineering & Manufacturing Co*., 859 F.2d 610 (9th Cir. 1988); *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009)).

In circumstances nearly identical to those in this case, the court in *Tyndale House* granted an injunction after finding a substantial burden on the plaintiffs' religious exercise due in large part to the financial consequences that the plaintiffs faced if they elected to not comply with the mandate.   2012 WL 5817323, at *12.   The court found that this presented the plaintiffs with a "Hobson's choice," and "amply show[ed] that the contraceptive coverage mandate substantially burdens the plaintiffs' religious exercise." *Id.*

*Tyndale House* involved a closely-held publishing company.   The publishing company was 96.5% owned by a non-profit religious corporation and sold religious products.   While these factors make *Tyndale House* arguably distinguishable from this case,  the *Tyndale House* court relied on two cases from

6

the Ninth Circuit Court of Appeals—*Townley* and *Stormans*—which both involve for-profit corporations that did not outwardly sell religious products. According to these decisions, a closely-held corporation may assert its owners' free exercise and RFRA rights where the corporate entity "is merely the instrument through and by which [the owners] express their religious beliefs." *Stormans*, 586 F.3d at 1120 (citing *Townley*, 859 F.2d at 619–20) (internal quotation marks omitted).

*Townley* involved a closely-held mining equipment company. The company was 94% owned by a husband and wife who were both members of the Catholic Church. *Townley*, 859 F.2d at 611. The couple sought to run the company in accordance with their faith, as they were "unable to separate God from any portion of their daily lives, including their activities at the Townley company." *Id*. at 612. The company sought a religious exemption from Title VII of the Civil Rights Act to allow the company to require its employees to attend weekly religious services. *Id*. As other courts have done, the *Townley* court declined to address the issue of whether a for-profit corporation has free exercise rights *independent* of the free exercise rights of the corporation's owners and officers. Instead, the court found that the corporation could assert the free exercise rights of its owners. *Id*. at 619–20, n.15.

The Ninth Circuit later relied on *Townley* to reach a similar conclusion in *Stormans*. The latter involved a fourth-generation pharmacy business owned and operated by members of the Stormans family. *Id*. at 1120. The pharmacy challenged a state law that required all pharmacies to provide Plan B to customers. *Stormans*, 586 F.3d at 1116–17. The family objected on religious grounds, claiming that the pharmacy was "an extension of the beliefs of the members of the Stormans family, and that the beliefs of the Stormans family [were] the beliefs of [the pharmacy]." *Id*. The court agreed, finding that the pharmacy did not "present any free exercise rights of its own different from or greater than its owners' rights" and holding that, as in *Townley*, the pharmacy "has standing to assert the free exercise rights of its owners." *Id*.

7

This case is analogous to *Tyndale*, *Stormans* and *Townley*—though the Court finds the facts in this case much stronger. DF does not present any free exercise rights of its own different from or greater than Monaghan's rights. Unlike *Tyndale*, *Stormans*, and *Townley*—where the companies in question had multiple owners—Monaghan is DF's *sole* shareholder, director, and decision-maker. As such, DF is even *more* closely-held than those companies, making the beliefs of DF and its owner even more indistinguishable.

Moreover, Monaghan has provided examples of how he runs DF with an eye towards his religion. Monaghan declares that he incorporates his religious beliefs into the daily operations of DF by, among other ways, providing tenants with a Catholic chapel offering daily mass services, a Catholic bookstore, a Catholic credit union, and food service providing Catholic menu options. *Cf. Stormans*, 586 F.3d 1109 (where plaintiffs offered no evidence of how their faith was incorporated into the running of the pharmacy business). It is not necessary for the Court to find that these acts by Monaghan constitute the "exercise of religion" by DF. DF is "merely the instrument through and by which Monaghan express[es] [his] religious beliefs." *Stormans*, 586 F.3d at 1120 (citations omitted). A conclusion in line with *Stormans* is thus warranted.

Additionally, the Court finds that decisions by the Courts of Appeals, under similar circumstances, do not preclude the Court from deciding this Motion in accordance with *Tyndale*, *Townley* and *Stormans*.

The Government relies on *Conestoga Woods Specialties v. Sebelius*, No. 13-1144, Opinion/Order (3d Cir. Feb. 7, 2013), to claim that DF, "as a secular, for-profit corporation," "has no free exercise rights under the First Amendment" or RFRA. The Government further argues that "incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Conestoga Wood Specialties Corp. v. Sebelius*, No. 12-6744, 2013 WL 140110, at *8 (E.D. Pa. Jan. 11, 2013) (citing *Cedric*

*Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001)).  As a number of courts have pointed out, however, the question of whether for-profit corporations possess free exercise rights is unresolved. *Tyndale House*,  2012 WL 5817323, at \*9 (citing *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 777–78 n.14 (1978) (recognizing that corporations have First Amendment speech rights, but declining to "address the abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment")); *Stormans*, 586 F.3d at 1119 (quotation omitted); *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1280 n.7 (5th Cir. 1981) (quotation omitted).  Nevertheless, even accepting the Government's argument does not foreclose the Court from finding that DF, although distinct from Monaghan, nevertheless may assert free exercise rights on Monaghan's behalf.  The Court sees no reason why DF cannot be secular and profit-seeking, and maintain rights, obligations, powers, and privileges distinct from those of Monaghan, while at the same time being an instrument through which Monaghan may assert a claim under the RFRA.

The Court is likewise not persuaded by the Government's reliance on *Hobby Lobby* to claim that "[g]eneral business corporations . . . do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors."  *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278, 1291 (W.D. Okla. 2012)).  Notwithstanding that DF need not perform these acts to assert an RFRA claim on behalf of Monaghan, there are nevertheless other ways—besides praying, worshipping, or observing sacraments—in which a corporation (and individuals, for that matter) might express a particular viewpoint on religion.  The Court points to the fact that DF provides a Catholic chapel and numerous mass services for its tenants, a Catholic bookstore on-site, and Catholic food options.  These services are presumably funded by DF.  The Supreme Court has found that corporations exercise First Amendment rights not only by adopting a particular view, but by using corporate funds to express that view.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

9

The Court sees no reason why a corporation cannot support a particular religious viewpoint by using corporate funds to support that viewpoint.

As such, the Court finds that DF is merely the instrument through and by which Monaghan expresses his religious beliefs. Accordingly, DF may assert an RFRA claim on Monaghan's behalf. The Court takes no position as to whether DF has an independent right to freely exercise religion. *See Legatus*, 2012 WL 5359630, at *4 ("[plaintiff corporation] was founded as a family business and remains a closely held family corporation. Accordingly, the court need not, and does not, decide whether [plaintiff], as a for-profit business, has an independent First Amendment right to free exercise of religion."). The Court turns next to the question of whether the mandate substantially burdens Monaghan's exercise of religion.

### 2. Substantial Burden

The Supreme Court has held that "putting substantial pressure on an adherent to modify his behavior and to violate his beliefs" substantially burdens the adherent's exercise of religion. *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981). *See also Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972) (finding that a challenged law substantially burdens the free exercise of religion if it compels plaintiffs "to perform acts undeniably at odds with fundamental tenets of their religious beliefs."). The exercise of religion under RFRA includes "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2 (emphasis added) (citing 42 U.S.C. § 2000cc-5). It is, however, "not the province of the court to tell the plaintiffs what their religious beliefs are, i.e. whether their beliefs about abortion should be understood to extend to how they run their corporations or the like, or to decide whether such beliefs are fundamental to their belief system." *Hobby Lobby*, 870 F. Supp. at 1293. *See also Thomas*, 450 U.S. at 718 (finding it beyond the scope of judicial function and competence for a court to decide whether a party is correctly understanding his religious doctrine because "[c]ourts are not arbiters of scriptural interpretation.").

The particular burden cited by Plaintiffs is the ACA's requirement that DF provide its employees a health insurance plan that includes coverage for the Preventive Services. The Catholic Church teaches that it is a sin to use, provide, or otherwise support these services. Monaghan is a member of the Catholic Church. He asserts that taking steps to have DF provide contraception coverage violates his beliefs as a Catholic. If Monaghan chooses to not have DF provide coverage in order to avoid the mandate, then beginning in 2014, DF will incur an annual penalty of $2,000 per full-time employee.

The Government does not dispute the sincerity of Plaintiffs' religious belief, but instead disputes that the mandate substantially burdens this religious belief. The Government argues that the mandate applies to DF, not Monaghan, and therefore any resulting burden on him is simply too attenuated to be substantial.

The Court finds that the mandate forces Monaghan to violate his beliefs and modify his behavior or else pay substantial penalties for noncompliance. Government action that places Monaghan in such a "Catch-22" dilemma sufficiently constitutes a substantial burden on his free exercise of religion. *Thomas*, 450 U.S. at 718; *Yoder*, 406 U.S. at 218 (finding that a challenged law substantially burdens the free exercise of religion if it compels plaintiffs "to perform acts undeniably at odds with fundamental tenets of their religious beliefs.").

The Government attempts to attenuate any burden on Monaghan by characterizing the acts to which he objects as merely the *use* of Preventive Services coverage, relying on *Autocam v. Sebelius*, *Conestoga v. Sebelius*, and *Hobby Lobby v. Sebelius*. These decisions, however, are distinguishable from this case and otherwise do not dissuade the Court's finding of a substantial burden.

First, the Government condemns the Court's neglect of a motions panel decision by the Sixth Circuit Court of Appeals in *Autocam v. Sebelius*, No. 12-2673 (6th Cir. Dec. 28, 2012). In that case, the Sixth Circuit acknowledged the conflicting decisions by a number of courts addressing similar cases, but nevertheless denied an injunction pending appeal based on the district court's reasoned opinion and

because "the Supreme Court [had] recent[ly] deni[ed] . . . an injunction pending appeal in *Hobby Lobby*." *Id.* at 2.[2]   The reasoned opinion of the district court is not persuasive and is inapplicable here, given that this case is factually distinguishable from *Autocam*.

In *Autocam*, the company in question provided a health savings account which employees could use for medical-related expenses—including contraception, sterilization, and abortions.   The plaintiffs attempted to draw a fine line between directing their company to pay directly for coverage for the objectionable services, and giving discretionary funds to their employees who may then choose to buy such services.   The district court found no substantial burden.   Presupposing that the plaintiffs objected to their insurance carrier paying for Preventive Services once an employee chose to use them, the district court found the line to be too fine, stating that the mandate "will keep the locus of decision-making in exactly the same place: namely, with each employee, and not the Autocam plaintiffs."   *Autocam*, 2012 WL 6845677, at *6.   According to the district court, there was little difference between giving employees a health savings account from which they could pay for an abortion (before the mandate), and directly providing coverage for abortions (after the mandate).   Here, however, the line is not so fine.

The pre-mandate to post-mandate leap is significant for Monaghan: there is quite a distinction between *not providing coverage* for contraception (before the mandate), and *providing coverage* for contraception (after the mandate).   Monaghan declares—and provides Catholic authority in support—that merely *providing coverage* for the Preventive Services is strictly against his religion.   The Court's task is not to question whether providing coverage is against Monaghan's religious beliefs; that much is largely taken on Monaghan's word.   *See Thomas*, 450 U.S. at 718; *Hobby Lobby*, 870 F. Supp. 2d at 1293.

---

[2] The Supreme Court opinion relied upon by the *Autocam* court was an in-chambers decision whereby Justice Sotomayor denied the plaintiffs' motion for an injunction pending appellate review.   *See Hobby Lobby Stores, Inc. v. Sebelius*, 133 S. Ct. 641 (Sotomayor, Circuit Justice Dec. 26, 2012).   Justice Sotomayor denied the motion using the Supreme Court's extraordinary writ standard.   *Id.* at 643.   That standard, however, is much more stringent than that used for a preliminary injunction. Under the more demanding standard, the entitlement to relief must be "indisputably clear."   *Id.* (citations omitted). The Court is therefore not persuaded by the in-chambers decision of the Supreme Court.

Rather, the Court's task is to determine whether this burden on Monaghan's religious exercise is *substantial*. The Court finds that it is. Monaghan must violate his beliefs and modify his behavior or else pay substantial fines. Losing a First Amendment right is without question an "irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). It is difficult to imagine how a threat of irreparable injury necessarily resulting from the coercion to forego a particular right *cannot* constitute a substantial burden on the exercise of that right. As such, this situation is quite different from that of *Autocam* because the "locus of decision-making" *does* change: the decision to provide coverage shifts from Monaghan to the Government. Therefore, a result different from that in *Autocam* is warranted.

Next, the Government opposes such a finding, arguing that "assuming a substantial burden merely because plaintiffs unilaterally assert one reads RFRA's legal requirement of substantiality completely out of the statute." The Government cites *Autocam*, 2012 WL 6855677, at *7 ("[t]his would subject virtually all government action to a potential private veto based on a person's ability to articulate a sincerely held objection tied in some rational way to a particular religious belief[ ]"), and *Conestoga*, 2013 WL 140110, at *13 (same). The Court disagrees.

Although Supreme Court free exercise jurisprudence suggests that a "substantial burden" is a difficult threshold to cross, determining such a burden is a highly fact-specific inquiry. *See LivingWater Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007). The facts here are indicative of a substantial burden on Monaghan's free exercise. The Government does not deny the sincerity of Monaghan's belief or the Catholic Church's position on the Preventive Services. The mandate pressures Monaghan to provide coverage for these services—against his beliefs—or else pay significant per-employee penalties. And, as Monaghan declares, such penalties would not merely make his free exercise significantly more expensive; the penalties also threaten his ability to remain competitive in the marketplace. This is not unlike facing a choice between following the precepts of religion and forfeiting benefits, or abandoning one of the precepts of religion in order to accept work—which the

13

Supreme Court deemed a substantial burden. *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). While the compulsion upon Monaghan may be *indirect*, the infringement upon his free exercise is nonetheless substantial. *Thomas*, 450 U.S. at 717–18 (emphasis added).

Last, again relying on *Hobby Lobby*, the Government argues "the particular burden of which plaintiffs complain is that funds, which plaintiffs will contribute to a group health plan, might, after a series of independent decisions by health care providers and patients covered by [the corporate] plan, subsidize *someone else's* participation in an activity condemned by plaintiff[s'] religion." *Hobby Lobby*, 2012 WL 6930302, at \*3. Yet, this mischaracterizes the burden placed on Monaghan. Monaghan's "particular burden" is that he is being compelled to provide *coverage* for the Preventive Services. Thus, the substantial burden on Monaghan's free exercise "inheres in the *coerced coverage*" of the Preventive Services, "*not*—or perhaps more precisely, *not only*—in the later purchase or use of contraception or related services." *Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353, at \*3 (7th Cir. Dec. 28, 2012). This distinction has played a significant role in determinations made by other courts under similar circumstances[3]—and here distinguishes this case from *Hobby Lobby*.

Accordingly, the Court finds that the mandate pressures Monaghan to modify his behavior and violate his beliefs because Monaghan would be forced to refrain from or change the way he exercises his faith through DF. His only other choice is to suffer severe financial harm to his company. Therefore, the

---

[3] *Compare Tyndale House*, 2012 WL 5817323, at \*13 ("[t]he plaintiffs' specific objection is not simply to the use of the contraceptives at issue, but to 'providing coverage for abortifacients and related education and counseling in [plaintiffs'] health insurance plan"); *Grote Indus., LLC v. Sebelius*, No. 12-134, 2012 WL 6725905 at \*6 (S.D. Ind. Dec. 27, 2012) ("[w]e acknowledge that Plaintiffs object not just to the use of contraceptives, but to the coverage itself" (emphasis in original)) with *Conestoga*, 2013 WL 140110, at \*13 ("the core of the [plaintiffs'] religious objection is the effect of particular contraceptives on a fertilized egg"); *O'Brien v. United States Dep't of Health and Human Services*, No. 12-476, 2012 WL 4481208 at \*6 (E.D. Mo. Sept. 28, 2012) ("[t]he burden of which plaintiffs complain is that funds, which plaintiffs will contribute to a group health plan, might, after a series of independent decisions by health care providers and patients covered by [plaintiffs'] plan, subsidize someone else's participation in an activity that is condemned by plaintiffs' religion"). Monaghan objects to paying for, providing, facilitating, or otherwise supporting the Preventive Services. Whether or not his employees actually obtain such services is irrelevant. This undermines the Government's "too-attenuated" argument.

mandate substantially burdens Monaghan's exercise of religion.  The Court turns next to the question of whether the mandate serves a compelling governmental interest.

       *3. Compelling Government Interest*

       The Government may substantially burden a person's exercise of religion "only if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest."  42 U.S.C. § 2000bb–1(b)(1).  A "compelling interest" is one "of the highest order."  *Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546 (1993); *Yoder,* 406 U.S. at 215.  The Government bears the burden of proof and "ambiguous proof will not suffice."  *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2739 (2011). To satisfy this burden, the Government must "specifically identify an 'actual problem' in need of solving," and show that substantially burdening Plaintiffs' free exercise of religion is "actually necessary to the solution."  *Id.* at 2739.

       The Government advances two interests furthered by the mandate. First, the Government states it has an interest in promoting public health generally.  Courts have assumed, sometimes without deciding, that the improvement of public health is, at least in some instances, a compelling interest.  *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 310 (1978) ("It may be assumed that in some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a suspect classification."); *Buchwald v. Univ. of N.M. School of Med.*, 159 F.3d 487, 498 (10th Cir. 1998) (finding that "public health is a compelling government interest").  The Government argues that the primary benefit of the regulations is that "individuals will experience improved health as a result of reduced transmission, prevention or delayed onset, and earlier treatment of disease."  *See* Dkt. 12 at 16. Additionally, the Government expects the regulations to increase access to and utilization of Preventative Services, which are not used at optimal levels today, by expanding coverage and eliminating cost sharing for the services.  *Id.*  According to the Government's theory, increased access to contraceptive services is a

key part of these predicted health outcomes, as a lack of contraceptive use may prove to have negative health consequences. *Id.*

The Government's second proposed interest is to "remov[e] the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women" by "[a]ssuring women equal access to . . . goods, privileges, and advantages[.]" *Id.* (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)). The Government states that by including in the ACA gender-specific preventive health services for women, Congress assured that the goals and benefits of effective preventive health care would apply with equal force to women, who might otherwise be excluded from the ACA. The Government notes that "women have different health needs than men, and these needs often generate additional costs. Women of childbearing age spend 68 percent more in out-of-pocket health care costs than men." *Id.* at 17. These costs result in women often forgoing preventive care. *Id.* Accordingly, this disproportionate burden on women creates "financial barriers . . . that prevent women from achieving health and wellbeing for themselves and their families." *Id.*

The Government, however, has failed to show that the mandate, as applied to Plaintiffs, serves a compelling interest. "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006). That is, of course, not to say that the Government does not have a compelling interest in the uniform application of a program. To establish this, however, the Government must offer evidence that granting the requested religious accommodations would seriously compromise its ability to administer this program. *See id.* at 435.

Severely undermining any claim in this regard is the existence of numerous exemptions to the mandate, resulting in approximately 190 million people falling outside of the mandate's purview. *See Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012) ("[t]he government has exempted over

190 million health plan participants . . . from the preventive care coverage mandate"); *Tyndale House*, 2012 WL 5817323, at *18 ("[i]ndeed, the 191 million employees excluded from the contraceptive coverage mandate include those covered by grandfathered plans alone."). The mandate "cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi*, 508 U.S. at 547. The Government's compelling interest is therefore called into question by the number of exemptions currently in existence.

Last, the Court examines whether the Government has used the least restrictive means of serving its purportedly compelling interest.

### *4. Least Restrictive Means*

Even if the government were able to establish a compelling interest in applying the preventive care coverage mandate to Plaintiffs, it must also demonstrate that there are no feasible, less-restrictive alternatives. 42 U.S.C. § 20000bb–1(b)(2). The Sixth Circuit describes the least restrictive means test as "the extent to which accommodation of the [plaintiff] would impede the state's objectives," and explains that "[w]hether the state has made this showing depends on a comparison of the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." *S. Ridge Baptist Church v. Indus. Comm'n*, 911 F.2d 1203, 1206 (6th Cir. 1990). The government need only refute alternatives proposed by Plaintiffs. *United States v. Wilgus*, 638 F. 3d 1274, 1289 (10th Cir. 2011).

Plaintiffs set forth several alternative means for the Government to use to address their interests. Plaintiffs propose that the Government could provide the contraceptive services directly, or perhaps offer incentives to employers who provide for such services (as opposed to sanctioning employers who do not). Plaintiffs additionally state that "contraceptive services are already readily available "at sites such as community health centers, public clinics, and hospitals with income-based support." Dkt. 20 at 15. *See also Newland v. Sebelius*, No. 12–1123, 2012 WL 3069154 at *15 (D. Colo. July 27, 2012).

The Government argues that Plaintiffs' alternatives would require considerable new costs, new legislation, administrative hurdles, and that none of the alternatives are as effective as the Government's chosen means. Defendants do not deny that Plaintiffs' alternatives would achieve the purpose of providing contraceptive services to women with no cost sharing, but argue that Plaintiffs' alternative will not guarantee minimal logistical and administrative obstacles to receiving coverage. Yet, the Government has not established its means as necessarily being the least restrictive. Defendants bear the burden of demonstrating that refusing to exempt Plaintiffs from the preventive care coverage mandate is the least restrictive means of furthering their compelling interest. And, given the existence of government programs similar to Plaintiffs' proposed alternative, the Court finds that the Government has failed to meet its burden. *See Newland v. Sebelius*, No. 12–1123, 2012 WL 3069154 at *8 (D. Colo. July 27, 2012) ("Defendants have failed to adduce facts establishing that government provision of contraception services will necessarily entail logistical and administrative obstacles defeating the ultimate purpose of providing no-cost preventative health care coverage to women.").

### 4. Conclusion

Plaintiffs have shown that abiding by the mandate will substantially burden their exercise of religion. The Government has failed to satisfy its burden of showing that its actions were narrowly tailored to serve a compelling interest. Therefore, the Court finds that Plaintiffs have established at least some likelihood of succeeding on the merits of their RFRA claim, or at least a "serious question" going to the merits of the claim. *Caruso*, 569 F.3d at 277. Accordingly, this factor weighs in favor of granting Plaintiffs' motion. The Court turns next to the remaining factors to consider when assessing preliminary injunctive relief.

## B. IRREPARABLE HARM TO PLAINTIFF

The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, when First

Amendment freedoms are at risk, the irreparable harm factor "merges" with the likelihood of success, such that if the plaintiff shows he is likely to succeed on the merits, he has simultaneously proven he will suffer an irreparable harm.   *See McNeilly v. Land*, 684 F.3d 611, 620–21 (6th Cir. 2012) ("Once a probability of success on the merits was shown, irreparable harm followed . . . .   Because [the plaintiff] does not have a likelihood of success on the merits, . . . his argument that he is irreparably harmed by the deprivation of his First Amendment rights also fails.").

Because Plaintiffs' claims involve a First Amendment right, and because the Court has found a likelihood that Plaintiffs' RFRA claim will succeed on the merits, the Court finds that irreparable harm could result to Plaintiff.   This factor therefore weighs in favor of granting Plaintiffs' motion.

## C. IMPACT ON PUBLIC INTEREST

The impact of a preliminary injunction on the public interest turns in large part on whether Plaintiffs' Constitutional rights are violated by the enforcement of the mandate.   "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."   *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see also Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (stating "the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties").   As noted, Plaintiffs' constitutional right to freely exercise religion is at issue in this case.   It is in the best interest of the public that Monaghan not be compelled to act in conflict with his religious beliefs.   This factor thus weighs in favor of granting Plaintiffs' motion.

## D. BALANCING HARM

Finally, the Court must balance the harm to Plaintiffs if the injunction is denied with the harm to the Government if the injunction is granted.   So long as Plaintiffs' have shown "serious questions" as to the merits of their RFRA claim, and irreparable harm that outweighs any potential harm to the

19

government, the Court may grant Plaintiffs' motion.   *Caruso*, 569 F.3d at 277 (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982)) (emphasis added).

As discussed above, denying Plaintiffs' motion will result in a substantial burden on Monaghan's right to free exercise of religion, since the mandate requires him to choose whether to comply and violate his beliefs, or accept the financial consequences of not doing so.  And, as noted, such an infringement upon Plaintiffs' First Amendment rights—even if for a short time—constitutes irreparable injury.  *See Elrod*, 427 U.S. at 373.

The Government will suffer some, but comparatively minimal harm if the injunction is granted. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (noting that "the government presumably would be substantially harmed if enforcement of a *constitutional* law . . . were enjoined"). The harm of delaying the implementation of a statute that may later be deemed constitutional is outweighed by the risk of substantially burdening the free exercise of religion.  *See Legatus*, 2012 WL 5359630 at *4.  Moreover, the harm of carving out, at least temporarily, an additional exemption for an organization with less than 100 employees can hardly be considered a significant or "irreparable" harm to the Government.  Therefore, this factor weighs in favor of granting Plaintiffs' motion.

## V.  CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Plaintiffs' Motion for a Preliminary Injunction [dkt 20] is GRANTED.

IT IS FURTHER ORDERED that the status quo established through the Court's December 31, 2012, Order granting Plaintiffs' Motion for Temporary Restraining Order shall remain in effect during the pendency of this case.

IT IS SO ORDERED.

Date:   March 14, 2013                                        s/Lawrence P. Zatkoff
                                                             Lawrence P. Zatkoff
                                                             U.S. District Judge